UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

GRANDE PROPERTIES             :        Hon. Joseph H. Rodriguez
DEVELOPMENT, LLC,

        Plaintiff,            :        Civil Action No. 10-736

    v.                        :

JP MORGAN CHASE COMMERCIAL    :             OPINION
SECURITIES TRUST 2008-C2,
WELLS FARGO & COMPANY, and    :
CW CAPITAL ASSET MANAGEMENT, LLC,

        Defendants.           :

This matter is before the Court on cross-motions for summary judgment. Oral argument was heard on June 21, 2011, and the record of that proceeding is incorporated here. For the reasons expressed on the record that day, and those below, Plaintiff's motion will be denied and Defendants' motion will be granted.

Background

On January 19, 2010, Plaintiff Grande Properties Development, LLC filed suit in the Superior Court of New Jersey, Chancery Division, Cape May County against JP Morgan Chase Commercial Mortgage Securities Trust 2008-C2, Wells Fargo & Company, and CW Capital Asset Management LLC. The case was removed to this Court on February 12, 2010.

Plaintiff is in the business of commercial real estate ownership and development, and is the developer of a 15 acre shopping center on property located on Route 9, Middle Township, Cape May County, New Jersey. The Middle Township property consists, in part, of a 161,000 square foot Wal-Mart store and approximately 25,000 square feet of continuous in-line retail stores, with adjacent parking facilities.

On January 20, 2005, Wal-Mart Real Estate Business Trust, as lessee, entered into a twenty-year Ground Lease Agreement with Plaintiff as lessor.  Pursuant to that Agreement, Wal-Mart constructed a 161,000 square foot store on the Middle Township property.  The Wal-Mart store on that property opened for business on June 13, 2007.

On October 25, 2007, Plaintiff entered into a loan transaction with CIBC, Inc. where Plaintiff was to borrow $14,600,000 from CIBC.  The loan was evidenced by a promissory note, secured by a mortgage, and designed to pay off Plaintiff's underlying construction financing.  As additional security for the loan, pursuant to section 1.28 of the mortgage, Plaintiff was obligated to deposit with CIBC a portion of the proceeds in the amount of $1,910,000, to be held in a Leasing Achievement Reserve fund (the "Holdback") to provide additional security to CIBC pending lease of the in-line stores.  On April 14, 2008, Plaintiff and CIBC entered into a Modification of Mortgage.

The executed mortgage was assigned to Bank of America N.A. f/k/a LaSalle National Bank as Trustee for the Defendant JP Morgan Chase Commercial Mortgage Securities Trust 2008-C2 ("the Trust").  Defendant Wells Fargo N.A., through Wells Fargo Commercial Mortgaging Servicing division, is the Master Servicer of the loan; Defendant CW Capital Asset Management, LLC is the Special Servicer of the loan.

On August 14, 2009, Wal-Mart and Plaintiff entered into a First Amendment to Ground Lease, pursuant to which Wal-Mart leased additional retail space from Plaintiff consisting of 6,250 square feet in the in-line stores.

On the same date, Wal-Mart and Plaintiff entered into a Lease Expansion Agreement, pursuant to which Wal-Mart agreed to lease an additional 25,000 square feet of space from Plaintiff in the rear of Wal-Mart's existing store, subject to Wal-Mart's

2

receipt of certain zoning and governmental approvals.  According to the Verified Complaint, Wal-Mart entered into the Lease Amendment and Lease Expansion Agreement to expand the existing Wal-Mart store into a Wal-Mart Supercenter, consisting of an additional 35,000 square feet of retail space in the in-line stores.

On August 17, 2009, Plaintiff provided Wells Fargo with the executed Lease Amendment and Lease Expansion Agreement and requested the release of the "Calculated New Lease Disbursement."  On August 19, 2009, Plaintiff completed a Wells Fargo Disbursement Request and Certification and demanded the balance of the Holdback reserve monies, $1,455,503.42.  A loan servicing specialist at Wells Fargo received the disbursement request on August 20, 2009.  On August 26, 2009, Plaintiff's President, Tom Juliano, sent an e-mail to Wells Fargo inquiring as to the status of the request.  He was advised the next day by Heather Dennis, CMS Reserves Manager at Wells Fargo, that the Wal-Mart Lease Amendment had been sent to the Wells Fargo Lease Review department, and that because of its size, the disbursement request required "Asset Manager approval."  At that time in August, the Asset Manager was on vacation for another full week, until September 3, 2009, the Thursday before Labor Day.

In the meantime, on August 31, 2009, Jessica Javier, a Loan Servicing Specialist with Wells Fargo, e-mailed Alex Leibowitz at CIBC as follows:

> We received a disbursement request from the Borrower for the remaining funds in the Leasing Achievement Reserve for $1,418,817.61.  We are quite confused with the conditions to release and wanted to make sure that we are in compliance with the requirements as listed in the Loan Agreement.
>
> Per section 1.28 of the Loan Agreement, Lender shall disburse to Borrower from time to time in accordance with the following conditions:

3

It is quite confusing for me to identify where the expansion for Walmart falls under which category – between New Approved Standard Lease or Standard New Lease disbursement.  Per the Borrower, Walmart will expand to an additional retail space of 6,250SF.  The Ground Lease for Walmart currently holds 161,180 sf.  If Walmart expansion falls under New Approved Standard Lease, then the calculation will be $12.14 x 6250 SF = $75,875 x $20(annual rent per SF) = $1,517,500.00.

Please let me know if you agree with my findings.  Additionally, they are requesting for funds prior to completion of the expansion space.  The Loan Agreement states that if the Borrower qualifies for the Standard New Lease Disbursement, the Approved Tenant Occupancy Conditions must be met.  In this case, Walmart site expansion has not been completed but they are paying full unabated rent for this space.

Your thoughts are greatly appreciated.

On September 10, 2009, the Managing Director of Real Estate Finance at CIBC sent an e-mail to Jessica Javier at Wells Fargo indicating that if CIBC were being asked for a disbursement of the Leasing Achievement Reserve, CIBC would agree to the release of the Holdback funds.

On the evening of September 14, 2009, Juliano e-mailed several people at Wells Fargo expressing outrage that Plaintiff's disbursement request had not yet been "handled."  The next morning, Heather Dennis informed Juliano that the Wal-Mart Lease Amendment required consent from the Special Servicer, CW, which was pending.  She continued, "we are required as Master Servicer to follow the loan documents, to deviate from the documents requires approval from the Asset Manager and in some cases the Special Servicer."

On September 16, 2009, Plaintiff drafted a letter to Susan Landry, Vice-President of Wells Fargo's Commercial Mortgage Servicing, and enclosed copies of the First Amendment to the Ground Lease Agreement and the Lease Expansion Agreement "as a courtesy."

4

On September 22, 2009, Juliano e-mailed Dennis to ask whether she heard anything regarding Plaintiff's request.  She advised him that they were awaiting word from the Special Servicer, which was a prerequisite to presenting the request to the Wells Fargo Asset Manager for approval.  She reiterated, "because we are the Master Servicer we are bound by the loan documents; the feedback from the original underwriters [CIBC] is helpful but the ultimate decision is with the Asset Manager. . . . Again, I understand your concerns and we will do everything on our part to expedite the process."

On September 25, 2009, Gregory Akins, CW Vice President, informed Felipe Sanchez, Wells Fargo Asset Administrator, that CW consented to the First Amendment to the Ground Lease between Plaintiff and Wal-mart.  He added, "Please note that [CW] reserves all of its rights under the loan and pooling and servicing documents to review, approve or deny the release of funds from the Leasing Achievement Reserve."  On September 30, 2009, Wells Fargo consented on behalf of CIBC to the First Amendment to the Ground Lease between Plaintiff and Wal-mart.

On October 6, 2009, Tej Barker, an analyst at CW, received the full disbursement request and supporting documents for the Leasing Achievement Reserve from Heather Dennis.  In the transmittal letter, Ms. Dennis expressed the following opinion:

> 1) The Wal-Mart expansion appears [to] meet the criteria under 1.28(g)(2)(ii)(b) since the Wal-Mart expansion does qualify under the Calculated New Lease Disbursement per the DSCR test performed by our Portfolio Analytics Group, but not under the "New Approved Standard Lease," the last criteria is occupancy. The semantics surrounding "Approved Tenant Occupancy" is that Wal-Mart has full rights to the space under the lease, the space cannot be marketed to the outside, Wal-Mart is paying full unabated rent and prorate expenses, no outside costs are associated with tenant improvements or leasing commissions however, they will not take physical occupancy until such time as they have approvals for the Supercenter, this may take the 3 year term of their lease.

2) Considerations to the occupancy issue would be if Wal-Mart did <u>not</u> take possession of the expansion space at the end of their lease term.  The Borrower would then have space that has not previously been built-out therefore, to mitigate the risk; the Lender should use the same guidelines as the loan documents state which is (at least) $15 psf for tenant improvement disbursement with the ability of the Borrower to access additional leasing costs through their Leasing Reserve.  It is reasonable to believe the amount needed for TI's would equate to $93,990.  Additionally, the Borrower shall meet the same criteria as the existing loan requirements for release of funds.

There were discussions among analysts at CW about the request being more of a modification than a disbursement request.  On October 27, 2009, Tej Barker e-mailed Heather Dennis asking when she could expect "a case from Wells with regards to the DSCR calculation and the occupancy modification.  As mentioned on the call, we'll put this request on hold until we receive a modification write up from you."

On October 29, 2009, counsel for CW advised counsel for Plaintiff as follows:

In connection with the First Amendment to the Wal-Mart lease, the borrower has requested disbursement of a Calculated Lease Disbursement (as defined under the Mortgage).  However, the First Amendment to the Wal-Mart lease does not qualify for such a disbursement because the First Amendment does not meet the Approved Tenant Occupancy Conditions (as defined in the Mortgage), which include the requirements that the tenant be conducting business under the demised premises as well as a tenant estoppel reasonably satisfactory to lender.

Nevertheless, the lender is willing to process a request for a disbursement from the Leasing Achievement Reserve.  Lender will need to obtain the approval of both its Master Servicer and Special Servicer for such a deviation from the requirements of the Mortgage.  As I mentioned on the telephone, lender may not ultimately approve such a request or there may be some sort of a reduction of the amount disbursed to Borrower.

Lender will require that Borrower pay its attorneys fees and costs associated with this matter.  We estimate such attorneys fees and costs to be $3,000, although the final amount could be higher or lower.
Please send have the borrower send [sic] us an e-mail acknowledging that it will pay such atty fees and costs on demand, and if not paid on demand, the borrower authorizes lender to deduct such fees and costs from any reserve established under the loan documents and remit the same to the lender's attorneys.  Or, the borrower can simply make a $3,000 legal retainer deposit to us.

Please be aware that the special servicer may impose conditions on any release from the reserve which does not meet the requirements of the Mortgage.

At some point, Wells Fargo had developed a Consent Action Plan, which analyzed Plaintiff's request for disbursement. Even though Wells Fargo found that the provisions of section 1.28(g) of the mortgage technically had not been met by Wal-mart, it recommended approval of the disbursement.

On December 1, 2009, Tej Barker signed off on a Consent Review Summary she prepared regarding the release of Holdback funds to Plaintiff. Under the heading "Approved Tenant Occupancy Conditions," Barker noted:

> While Walmart is renting the 6,250SF and has commenced paying rent, Lender has not received the tenant estoppel from the tenant. Based on conversation with Mike McCoy and Mike Anderson at Anderson, McCoy & Orta, the 1st Amendment to the Lease that was approved is part of the Ground Lease Agreement that has been in place since 2007.

Barker therefore recommended that the request of the release of funds from the Leasing Achievement Reserve be denied. Such recommendation was forwarded to a committee for review.

Nonetheless, the record indicates that Wells Fargo and CW continued to explore if there was a way to release a portion of the Holdback funds to Plaintiff. A December 14, 2009 e-mail from Tej Barker to Heather Dennis stated, "while we are open to reaching some kind of compromise of this request - our concern is that we do need to have funds left in this reserve in the event Walmart does vacate the premises after the 3 years."

On December 18, 2009, Juliano forwarded Heather Dennis an estoppel certificate from Walmart. The same day, he spoke with Tej Barker and she "[t]old [him] she hopes

7

to have an answer for [him] by the end of the year . . . they are reviewing everything."

Because CW did not disburse the Calculated New Lease Disbursement to Plaintiff, suit was filed in January of 2010.  Plaintiff alleges that Defendants have made demands which are not required by the mortgage, and have fabricated pretextual conditions to justify the refusal to make the disbursement of Holdback funds.  The Complaint asserts a claim of breach of contract and a claim of breach of covenant of good faith and fair dealing.

Defendants contend that release of the Holdback funds was subject to: (1) the lease of the remaining available retail space within the center and (2) satisfaction of certain other conditions precedent by both Plaintiff and its prospective tenants as outlined in section 1.28(g) of the mortgage.  Defendants maintain that Plaintiff and tenant Wal-Mart were not in compliance with these conditions.  Specifically, Defendants contend that the First Amendment to the Ground Lease between Plaintiff and Wal-Mart, which added approximately 6,250 square feet to the original Wal-Mart Ground Lease, does not meet the definition of a "New Approved Lease" under the mortgage.  In addition, Defendants contend that Wal-Mart has not taken possession of the 6,250 square feet of space, nor is Wal-Mart conducting any business with the public from that space, which sits empty and unfinished, with no electricity, lights, or signage. Defendants argue that upon its October 5, 2009 receipt from Wells Fargo of the request for approval or non-approval of the disbursement, CW engaged in a 5-layer good faith analysis of Plaintiff's request for a Calculated New Lease Disbursement, and promptly denied Plaintiff's request as of October 29, 2009.

8

Discussion

A. Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (a). The Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.;

9

Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322. That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact." Fed. R. Civ. P. 56(c)(1)(B); accord Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Credibility determinations are the province of the factfinder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

B. The Contracts

Section 1.28(g) of the mortgage provides:

Leasing Achievement Reserve. Simultaneously herewith, Borrower shall deposit with Lender the sum of $1,910,000.00 to be held in a reserve fund (the "Leasing Achievement Reserve") (such amount of funds shall be referred to as the "Leasing

Achievement Funds"), as additional security for the Obligations and the Loan. So long as no Event of Default shall exist and be continuing, Lender shall, to the extent any Leasing Achievement Funds are available for the purposes set forth below, disburse to Borrower from time to time the Leasing Achievement Funds in the Lease Achievement Reserve (each disbursement of Leasing Achievement Funds from the Leasing Achievement Reserve is a "Disbursement" and collectively, the "Disbursements") in accordance with the following conditions:

(1) Lender shall have received Borrower's written request for each Disbursement (each, a "Disbursement Request") at least ten (10) days in advance of each Disbursement. Each Disbursement Request shall specify the amount of Leasing Achievement Funds for which Borrower has qualified based on the procedures for Disbursement set forth in subsection (2) below.

(2) Borrower shall qualify for the Disbursements set forth below each time the applicable conditions are satisfied under any of the following:

*   *   *

(ii)(b) In the event a Tenant under a New Approved Standard Lease or a New Approved Lease . . . has satisfied the Approved Tenant Occupancy Conditions but does not qualify for the Standard New Lease Disbursement, Borrower may qualify for the Calculated New Lease Disbursement . . . .

*   *   *

(3) As used in this Section 1.28(g), the following capitalized terms shall have the respective meanings as set forth below:

*   *   *

(ii) "Approved Tenant Occupancy Conditions" shall mean the Tenant under a New Approved Lease satisfies the following conditions: (I) such Tenant take actual possession and occupancy, is conducting business with the public from the space demised under the New Approved Lease and is paying full, unabated rent; (ii) all work to be performed and paid for by Borrower, as landlord under the New Approved Lease, has been fully performed and paid for; and (iii)Lender has received an estoppel certificate from the Tenant under the New Approved Lease in form and substance reasonably satisfactory to Lender.

*   *   *

(iv) "Calculated New Lease Disbursement" shall mean an amount that when taken together with the Base Loan Amount causes the DSCR to be at least 1.10 to 1.0 (as determined by Lender and based on tenants actually in occupancy and open for business with the public as of the date of determination and rent actually collected), provided, however, that Lender shall not be required to make any Calculated New Lease Disbursement in an amount less than $150,000.00 (unless such lesser amount is the final Disbursement).

(v) "DSCR" shall mean the quotient obtained by dividing (a) Underwritten Net Operating Income by (b) the product obtained by multiplying the monthly principal and interest debt service payments on the Base Loan

Amount at the Note Rate and assuming a thirty (30) year amortization schedule (as determined and calculated by Lender) times the number of months in the period of determination.

\*   \*   \*

(vii) "<u>New Approved Lease</u>" shall mean valid and binding Leases which have been duly entered into after the date hereof [October 25, 2007] by Borrower and the applicable tenant in accordance with Section 1.10 above and covering a portion of the space comprising the Other Real Estate at the Property.

\*   \*   \*

(xiii) "<u>Other Real Estate</u>" shall mean that portion of the Real Estate not demised to Wal-Mart under the Wal-Mart Lease, which portion consists of approximately 25,000 square feet of space at the Property.

Section 1.29 of the mortgage provides:

<u>Disbursements from the Property Reserve Accounts</u>.

\*   \*   \*

Disbursements shall be made to Borrower within seven (7) days following Lender's receipt of each of the following: [requirements a through f].

\*   \*   \*

Lender shall be entitled to rely on the disbursement request from borrower without any inquiry into the accuracy, validity or contestability of any amount set forth therein. . . .  The Reserves are solely for the protection of the Lender, and entail no responsibility on Lender's part beyond making disbursements upon strict satisfaction of the requirements of Section 1.28 and this Section 1.29 . . . .

C.  <u>Analysis</u>

"Where a contract is ambiguous, courts will consider the parties' practical construction of the contract as evidence of their intention and as controlling weight in determining a contract's interpretation; where the terms of a contract are clear, however, the court must enforce it as written."  <u>County of Morris v. Fauver</u>, 103, 707 A.2d 958, 969 (N.J. 1998) (citing <u>Koshliek v. Board of Chosen Freeholders</u>, 365 A.2d 492 (N.J. Super. Ct. Law Div. 1976)).  Thus, while "[t]he polestar of contractual interpretation is the intent of the parties, . . . [t]he starting point in ascertaining that intent is the language of the contract."  <u>Communications Workers of Am., Local 1087 v.</u>

<u>Monmouth County Bd. of Social Servs.</u>, 476 A.2d 777, 782-83 (N.J. 1984) (citations omitted).  The court cannot make for the parties a better contract than the parties made for themselves.  <u>Karl's Sales & Service, Inc. v. Gimbel Brothers, Inc.</u>, 592 A.2d 647, 650-51 (N.J. Super. Ct. App. Div. 1991).  It is the intent expressed or apparent in the writing that controls.  <u>Friedman v. Tappan Development Corp.</u>, 126 A.2d 646, 650 (N.J. 1956).

To establish a breach of contract claim against Defendants, Plaintiff must prove that (1) the parties entered into a contract containing certain terms; (2) the plaintiff did what the contract required the plaintiff to do; (3) the defendant did not do what the contract required the defendant to do; and (4) the defendant's breach, or failure to do what the contract required, caused a loss to the plaintiff.  <u>Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.</u>, 275 F. Supp. 2d 543, 566 (D.N.J. 2003).  During oral argument, when asked to explain the breach of contract claim, Plaintiff's counsel stated that "the contract says release the money."  It appears clear, however, that Defendants are not parties to the contract between Plaintiff and its Lender, CIBC.  Rather, Defendants' responsibilities are governed by the May 1, 2008 Pooling and Servicing Agreement between JP Morgan Chase Commercial Mortgage Securities Corp., CW, Wells Fargo, Midland Loan Services, and Bank of America, N.A. f/k/a LaSalle National Bank.[1]  Thus, the parties to this lawsuit did not enter into a contract with each other.

In addition, Plaintiff did not do what was required under the terms of the mortgage, in that a prerequisite to releasing the funds was the Approved Tenant

---

[1]  The Pooling and Servicing Agreement requires Wells Fargo and CW "diligently service and administer the Mortgage Loans and the Companion Loans it is obligated to service . . . on behalf of the Trust and in the best interests of and for the benefit of the Certificateholders."

Occupancy Condition that the Lender be provided with an estoppel certificate from the Tenant, which was not provided by Wal-Mart until December of 2009.

The only Defendant which Plaintiff seems to take issue with is CW; Plaintiff does not contend that Wells Fargo or the Trust breached any contract. As to the purported claim of breach of contract by CW, Defendants have shown that they were justified in denying the release of the Holdback funds because the August 14, 2009 First Amendment to the Ground Lease does not qualify as a "New Approved Lease" under the mortgage. A "New Approved Lease" must have been duly entered into after the date of the mortgage, October 25, 2007, and must cover a portion of the space comprising the Other Real Estate at the Property. The Ground Lease Agreement between Plaintiff and Wal-Mart is dated January 20, 2005. Although the First Amendment to the Ground Lease was entered into after the date of the mortgage, the original date of execution of the Ground Lease governs. As a result, there was no "new" valid and binding lease duly entered into after the date of the mortgage, October 25, 2007. In addition, the lease does not "cover[] a portion of the space comprising the 'Other Real Estate' at the Property." "Other Real Estate" is "that portion of the Real Estate not demised to Wal-Mart under the Wal-Mart Lease, which portion [at the time of the execution of the mortgage] consist[ed] of approximately 25,000 square feet of space at the Property." Once the Ground Lease was amended, the space that was demised to Wal-Mart increased by the 6,250 square feet at issue and the "Other Real Estate" at the Property consisted of the remaining 18,750 square feet.

Moreover, even if the First Amendment were to be considered a "New Approved Lease," Plaintiff did not meet the requirements for release of the Holdback funds

14

because Wal-Mart did not meet the Approved Tenant Occupancy Conditions of the mortgage.  The 6,250 square foot space at issue is three stores down from the Wal-Mart store.  It is vacant retail space, with no lighting, signage, or electricity.  Despite Plaintiff's argument that such an interpretation of "conducting business with the public" is "overly literal," under the plain meaning of the language of the contract and the sworn statement of its representative, Wal-Mart is not conducting business with the public from the 6,250 square feet of retail space at issue.

The Court has taken into some consideration the course of dealing among the parties to the lawsuit.  Plaintiff has previously requested, and received, releases of Holdback funds when spaces in the retail center were leased and opened to the public for business.  The record contains evidence that once Supercuts and Rio Steak and Pizza opened for business with the public, Holdback monies were released.

The Court is mindful of Plaintiff's argument that it has now leased the entirety of the Middle Township retail center, "virtually ensuring that Defendants are repaid on the promissory note in addition to insuring overall success of the retail center."  That argument, however, does not mean that the Defendants have breached the contract entered into by Plaintiff.  Nor does the argument that, in deciding to lease to Wal-Mart, Plaintiff "made a commercially sound business decision, one which would benefit both sides to the mortgage" mean that Defendants have breached a contract to service Plaintiff's loan.

Turning to the claim of breach of covenant of good faith and fair dealing, there is correspondence in the record evidencing good faith efforts by the defense to make the release work.  As a threshold matter, however, there can be no breach of the implied

15

covenant of good faith and fair dealing unless the parties have a contract.  <u>Wade v.</u>
<u>Kessler Institute</u>, 798 A.2d 1251, 1262 (N.J. 2002).  As pointed out above, there is no
contract between the parties here.

In addition, the plaintiff must prove that the defendant acted in bad faith with the
purpose of depriving the plaintiff of rights or benefits under the contract, and, finally,
the plaintiff must prove that the defendant's conduct caused the plaintiff to suffer injury,
damage, loss or harm.  <u>Id.</u>  Here, although Plaintiff asserts that CW's "true purpose"
"was to retain funds in the disbursement account in order to further secure their
interest," the record does not support a "game plan" not to release the funds at issue.

In contrast, the record evidence makes clear that Defendants have diligently
serviced and administered the mortgage loan at issue on behalf of the trust.  First, a
review of the terms mortgage shows that Defendants did not have to approve or deny
disbursement of Holdback funds within ten days of request for their release.  In fact, the
language of the mortgage, as set forth above, states that "Lender shall have received
Borrower's written request for each Disbursement . . . at least ten (10) days in advance of
each Disbursement."  Clearly, this does not mean that the Lender has only ten days to
turn around the request.

The mortgage also provides, "Disbursements shall be made to Borrower within
seven (7) days following Lender's receipt of each of the following: (a) a written request
from Borrower for such disbursement, accompanied by a certification by Borrower, in
the form therefor then customarily utilized by Lender or Lender's servicing agent;
[requirements b through f]."  This section concludes, in part: "The Reserves are solely
for the protection of the Lender, and entail no responsibility on Lender's part beyond

16

making disbursements <u>upon strict satisfaction of the requirements</u> of Section 1.28 and Section 1.29." (Emphasis added.) As discussed above, the requirements of Section 1.28 were not satisfied by Plaintiff and its tenant.

Next, much has been made of the DSCR requirement and possible flaws in Barker's calculation thereof, but the 6,250 square feet of retail space now leased to Wal-Mart is not open to the public. In addition, performance of due diligence in attempt to honor the terms of the mortgage does not equate to bad faith. A defendant who acts in good faith on an honest, but mistaken, belief that her actions were justified has not breached the covenant of good faith and fair dealing. Model Jury Charge (Civil) 4.10J "Implied Terms - Covenant of Good Faith and Fair Dealing" (September 2009).

As discussed during oral argument, the Court understands that the Lender could feel secure in the fact that Wal-Mart has leased the premises in question and has applied for the necessary approvals to expand to a Supercenter. Nonetheless, Plaintiff has not complied with the provisions in the mortgage that it negotiated, with the assistance of an attorney, for the release of Holdback monies. Even though Plaintiff has deemed the requirements "overly technical compliance," Plaintiff agreed to the terms of the agreement, and that Section 1.28 of the mortgage must be strictly satisfied before release of Holdback funds.

Finally, counsel for Plaintiff has stated that if the Court finds that these Defendants are not parties to a contract with his client, he would seek to assert a tortious interference with contract claim. However, that issue is not properly before the Court at this time.

17

<u>Conclusion</u>

For these reasons, and in keeping with the discussion held on the record at oral argument, Plaintiff's motion for summary judgment is denied, and Defendants' cross-motion for summary judgment is granted.

An appropriate Order has been issued.


Dated: July 6, 2011                                  /s/ Joseph H. Rodriguez
                                                     JOSEPH H. RODRIGUEZ
                                                          U.S.D.J.